UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
        Plaintiff, )
)
v. ) Civil Action No.
)
160 EASY STREET, NORTH HARWICH, )
MASSACHUSETTS, ) 05 10961 MEL
        Defendant.

### VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to Title 21, United States Code, Section 881(a)(7), alleges that:

    1.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§1345, 1355, and 1356. Venue is appropriate pursuant to 28 U.S.C. §1395.

    2.    The in rem Defendant Property is now, and, during the pendency of this action, will be within the jurisdiction of this Court.

    3.    The Defendant Property consists of the real property located at 160 Easy Street, North Harwich, Massachusetts, (the "Defendant Property" or "160 Easy Street").

    4.    As detailed in the Affidavit of United States Drug Enforcement Administration Special Agent Thomas W. Millar, attached hereto as Exhibit 1, and incorporated herein by reference, the United States has probable cause to believe that the Defendant

Property constitutes real property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of, 21 U.S.C. §§841, 846, and/or 856.

5.  The Defendant Property is, therefore, subject to seizure and forfeiture to the United States of America, pursuant to 21 U.S.C. §881(a)(7).

WHEREFORE, the United States of America prays:

1.  That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts, commanding him to serve process upon the Defendant Property, and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.  That judgment of forfeiture be decreed against the Defendant Property;

3.  That thereafter, the Defendant Property be disposed of according to law; and

4.  For costs and all other relief to which the United States may be entitled.

>                   Respectfully submitted,
>                   MICHAEL J. SULLIVAN
>                   United States Attorney
>
>              By:  /s/ Jennifer H. Zacks
>                   JENNIFER H. ZACKS
>                   Assistant U.S. Attorney
>                   1 Courthouse Way, Suite 9200
>                   Boston, MA 02210
>                   (617) 748-3100

Dated: 5/10/05

## VERIFICATION

I, Thomas W. Millar, Special Agent, United States Drug Enforcement Administration, state that I have read the foregoing Verified Complaint for Forfeiture <u>In Rem</u> and the Affidavit, attached as Exhibit 1, and that the contents thereof are true to the best of my knowledge, information and belief.

                                        Thomas W. Millar, Special Agent
                                        United States Drug Enforcement Administration

Dated:


### COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                                                  Boston

    Then personally appeared before me the above-named Thomas W. Millar, Special Agent, United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

    Subscribed to and sworn to before me this 10th day of May, 2005.



                                                Notary Public
                                                My commission expires: 4/9/2010

N:\LTalbot\Zacks\160 Easy Street\Complaint for Forfeiture.wpd

**EXHIBIT 1**

**AFFIDAVIT OF SPECIAL AGENT THOMAS W. MILLAR**

I, Thomas W. Millar, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I have been so employed for the past 21 years. I am presently assigned to the DEA's Cape Cod Drug Task Force. I have participated in hundreds of investigations relating to the distribution and sale of controlled substances such as heroin, cocaine, cocaine base (commonly known as "crack"), and marijuana, and am familiar with the methods, routines, and practices of narcotics traffickers. Through my training and experience, I have become familiar with various items used to compound, process, deliver, and serve as containers for heroin, cocaine, marijuana, and other controlled substances.

2. The information contained in this affidavit is based on my personal experience, information obtained from other law enforcement officers, including Detective Robert Brackett of the Harwich Police Department, reports and documentary and physical evidence. This affidavit does not contain all the information relating to the investigation, but sets out that information necessary to show that there is probable cause to believe that the real property located at 160 Easy Street, North Harwich, Massachusetts, (the "Defendant Property" or "160 Easy Street") was used, or intended to be used to commit, or to facilitate the

commission of, a violation of Title 21, United States Code, Sections 841, 846, and/or 856. The Defendant Property is, therefore, subject to forfeiture to the United States of America pursuant to 21 U.S.C. §881(a)(7).

3. The Defendant Property was purchased by Leonard Miranda in January of 2002 as an empty lot. A house was later constructed on this lot and an occupancy permit was issued on or about May 17, 2002 for the Defendant Property. The current owners of record are Leonard and Brenda Miranda, who live at 3 Marie Lane, North Harwich, which is approximately 1/10th of a mile from the Defendant Property. Their son, Jeremiah Miranda (Miranda) has lived at the Defendant Property since approximately May 2002.

4. In October 2001, the Harwich Police Department began to receive information that Miranda was involved in distributing narcotics. During the investigation, law enforcement learned that although Miranda did not appear to have a job, he owned three vehicles, as follows:

- a 1996 Chevy Tahoe, purchased by Miranda on or about November 20, 2001, and subsequently sold and replaced by a 2001 Ford F-150 truck, purchased on or about July 22, 2002;
- 1989 Ford Mustang GT convertible, purchased by Miranda on or about June 8, 1999; and
- 1992 Nissan Maxima, purchased by Miranda on or about July 27, 2001.

Later in the investigation, law enforcement discovered that although Miranda was still not gainfully employed, he was in the process of having a house built on the Defendant Property.

2

5. In May 31, 2002, Detective Brackett received a telephone call from a cooperating individual (CI), who reported that Miranda had offered to sell marijuana. Acting under the supervision of the Harwich Police, the CI conducted several controlled buys of drugs from Miranda, that is, narcotics transactions set up, and monitored, by the police. Prior to each of these transactions, the CI was searched for narcotics. Using money supplied by the officer, the CI then purchased drugs from Miranda and, following the transaction, turned the drugs over to the police.

6. These included the purchase of 1/4 ounce of marijuana on May 31, 2002 and the purchase of 9.9 grams of marijuana on June 11, 2002. Below, I discuss in more detail those controlled purchases and other events that demonstrate probable cause to believe that the Defendant Property was being used to facilitate illegal narcotics trafficking.

7. On June 19, 2002, Detective Brackett was contacted by the CI, who said that Miranda had told the CI to come by the Defendant Property whenever the CI was ready to purchase marijuana. Miranda had offered to sell an ounce of marijuana to the CI for $325. A controlled purchase was arranged and the CI agreed to meet Miranda at the Defendant Property to conduct the deal. However, at approximately 7:38 p.m., while the CI was en route to the Defendant Property, Miranda was seen leaving the Defendant Property in a white Oldsmobile Sedan, with Massachusetts License No. 2406LO,

registered to Brandon Gomes ("Gomes") of Harwich. At approximately 7:40 p.m., when the CI arrived at the Defendant Property, Miranda was not there. At approximately 7:42 p.m., the CI and Miranda talked by cell phone and Miranda agreed to meet the CI at the CI's residence in 20 minutes. The CI went to its residence. At approximately 8:15 p.m., Gomes, driving the white Oldsmobile, arrived back at the Defendant Property with Miranda. Miranda got out of the car and briefly entered the Defendant Property. At approximately 8:28 p.m., Miranda came out of the Defendant Property and got into his own vehicle, a black Chevy Tahoe with Massachusetts License No. 6640TH, which he drove to the CI's residence, arriving at approximately 8:33 p.m. There, Miranda met the CI on the front steps and, in exchange for $325 in recorded U.S. currency, Miranda gave the CI a plastic baggie containing approximately 28.3 grams of marijuana. Based on this sequence of events, as well as my training and experience, I believe that Miranda returned to the Defendant Property to get the marijuana needed for the deal with the CI.

8. At approximately 12:30 a.m. on September 21, 2002, patrol officers were called to the area of Depot Road and Dusty Way in Harwich for a report of a noise complaint/loud party. Upon arrival at the scene, officers learned that the party was being held at the Defendant Property. At that time, officers advised Miranda of the noise complaint and told him to keep the noise down. The officers

then left the area. At approximately 2:34 a.m., officers were again called back to the Defendant Property for complaints of a disturbance (loud noise/people fighting). The complaints were from neighbors who heard people running through their yards. At this time, officers spoke with Miranda and Aaron Rose ("Rose") when they arrived at the Defendant Property. Rose had apparently been instigating a fight with other party guests that had left prior to the officers' arrival. Miranda told the officers that he would take control of Rose, who had shown signs of intoxication, and would keep Rose inside for the rest of the evening. Both Miranda and Rose then went inside the Defendant Property. At this time, the officers then drove around the area in an attempt to locate the partygoers that had left the party at the Defendant Property and were reported to be running through the yards of neighbors. While checking the neighborhood, officers again encountered Rose, at the end of the driveway at the Defendant Property. Rose stated to the officers that he was walking home. Because Rose was belligerent and intoxicated, he was taken into protective custody and was brought back to the Harwich Police Department for booking. During the booking process, a clear plastic corner cut baggie was located in Rose's left sock, in the calf area. This baggie contained an off-white powder substance with chunks, with an approximate gross weight of 9.5 grams. This substance later tested positive for cocaine. Rose stated that he had gotten the crack cocaine from

Miranda. Specifically, Rose stated that he had been inside the Defendant Property attending a house party when things had gotten loud and people started to fight. Miranda realized that the police would be responding, and when he heard the police arriving at the Defendant Property, Miranda handed the baggie containing the crack cocaine to Rose to hold while the police were there. Miranda then told Rose to "get rid of it". Rose then stated to police that Miranda had a supply of marijuana and cocaine in the Defendant Property, explaining that Miranda keeps his marijuana and cocaine in shoeboxes in the closet in Miranda's bedroom. Rose told the officers that Miranda had over 2 ounces of cocaine and a "few" pounds of marijuana at the Defendant Property. Rose was subsequently charged with possession of a Class "B" substance.

9. On December 4, 2002, Miranda agreed to sell a second confidential informant ("CI2") cocaine. In a transaction monitored by the police, Miranda gave CI2 a plastic baggie containing a white powdery substance in exchange for $150 in recorded funds. CI2 reported that Miranda had been very nervous. The substance in the baggie tested negative for cocaine. Acting under the direction of the police, CI2 contacted Miranda, who told CI2 that he had intentionally sold fake cocaine as a test, to make sure he was not being set up. Miranda told CI2 that he would make it up to CI2 later in the week, but Miranda did not make up for the bad bag sold to CI2. CI2 informed the police that Miranda was supplied with

cocaine by Stanley and Josh Gonsalves. Stanley and Josh Gonsalves live in Dennis, Massachusetts, and are known to be involved in the distribution of narcotics.

10. On February 28, 2003, based on the investigation, arrest warrants were obtained charging Miranda with distribution of Class "B" and "D" substance and conspiracy to violate the controlled substance laws. That evening, officers conducted surveillance at the Defendant Property. Between approximately 6:30 pm and 8:40 pm, the officers noticed several vehicles arriving at the Defendant Property. Each of these cars drove to the end of the road where the Defendant Property is located, pulled up to the Defendant Property, and then, after a brief period of time, left. People were observed to go into the Defendant Property and stay for short periods of time before leaving. These cars were easily visible, because the Defendant Property is located at the end of a long dirt road and is the only house on the street. Based on my training and experience, this is consistent with the trafficking and sale of narcotics, where individuals purchasing drugs arrive at a known drug distribution location, enter for a short period of time, and leave shortly thereafter.

11. At approximately 8:40p.m., a white sedan with licence plate MA/PC 4585YK pulled up to the Defendant Property. A person got out of the car, approached the Defendant Property, and went inside. After a brief period, the person returned to the vehicle,

which drove off.

12.  The white sedan was followed by Officer Chris Vanness of the Harwich Police, who was driving a marked police cruiser, and by Detective Brackett, who was driving an unmarked vehicle. Approximately 5 minutes after leaving the Defendant Property, and approximately 1.5 miles from the Defendant Property, the white sedan was stopped for a traffic violation. When Detective Brackett approached the white sedan, he saw that it had three occupants, two in the front seat and one in the back seat. Detective Brackett also saw that the passenger in the back seat was bending over as if he were reaching under the front passenger seat. Detective Brackett recognized the back seat passenger as Stanley Gonsalves ("Gonsalves"), whom he knew to have an open court case for possession of a firearm. Detective Brackett also recognized the front seat passenger as Todd Mikita, whom he had previously arrested for narcotics violations. When the three occupants were removed from the vehicle, Detective Brackett noticed the odor of burnt marijuana. During a pat-down of the three occupants, it was discovered that Gonsalves had a large quantity of money, bundled in elastic bands, in his pocket. Under the front seat, where Gonsalves had been reaching, the police discovered a ceramic pipe with apparent traces of marijuana, a portable digital scale with a white powdery residue, and a plastic baggie with one corner cut off. The driver of the car was Wesley Langway ("Langway"). Later,

during the investigation, it was learned that Langway was a resident of the Defendant Property. Langway stated that all the items found in the car belonged to Gonsalves.

13. Gonsalves was placed under arrest and transported to the Brewster Police Department. When the money that Gonsalves had in his pocket was examined, it was found to consist of a total of $4,362. The money was divided into six separate stacks, four of which were bound with elastics. The four elastic-bound stacks each contained bills totaling $1,000. One of the other two stacks totaled $212 and the other $150.00.

14. Meanwhile, at approximately 8:55 p.m., Miranda left the Defendant Property in a vehicle registered to his girlfriend. Miranda was followed and was subsequently stopped and arrested on the outstanding warrants. While being booked at the Harwich Police Department, a piece of paper was found in Miranda's wallet. The wallet had been in Miranda's pants pocket when he was arrested. The piece of paper had the following names on it: Wes; Todd; Needa; Bobby; John A; and Tuggie. There were numbers listed next to each name. Some names had the numbers crossed out, and others showed different sets of numbers crossed out in descending amounts. The names that still had numbers next to their names were: Wes-1050; Needa-40; John A-125; and Tuggie-1300. Based on my training and experience, I recognize this document to be a "cuff sheet," a document often kept by narcotics dealers, listing the names of drug

customers owing money and the amounts owed by each customer.

15. A state search warrant was obtained for the Defendant Property and a search was conducted in the early morning on or about March 1, 2003. The master bedroom contained a number of papers with Miranda's name and signature. A trained and certified drug detection canine alerted strongly to the left side of the master bedroom closet. On the top shelf of the closet, the searching officers found a portable digital scale and a box of approximately 180 unused plastic baggies. Another ziplock baggie was found on the closet shelf containing approximately 7.8 grams of "cut," a substance commonly used to dilute cocaine for sale. Also, on the top shelf of the master bedroom closet, stored inside a sneaker, was a large baggie containing 16 smaller baggies, each with the corner cut off, and each containing cocaine. Fifteen of these smaller baggies contained approximately one gram of cocaine each and the other baggie contained approximately 1/2 gram cocaine. Another baggie was found in the closet containing an approximate gross weight of 1/4 ounce of marijuana.

16. In addition to the narcotics found at the Defendant Property, officers also found a large quantity of money order receipts for Miranda's expenses, (i.e. vehicle payments, credit card payments, utilities, etc.), indicating that Miranda has access to large quantities of cash and spends a substantial amount of money.

17. During March 2005, law enforcement was informed by CI that Miranda continued to be sell cocaine from the Easy Street residence. After receiving that information, the Easy Street residence has been monitored, and lots vehicular traffic has been observed, in which a vehicle will arrive at the residence, the occupant will enter the residence and, shortly thereafter, depart in the vehicle.

Signed under the pains and penalties of perjury this 10th day of May, 2005.

_____
Thomas W. Millar
Special Agent
U.S. Drug Enforcement Administration